UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIAM A. SAGER,

      **Plaintiff,**

v.                                  **Case No.  8:10-cv-1069-T-30TGW**

CITY OF PORT RICHEY, MATHIAS J.
BREWI, JAMES V. MATHIEU, JR.,
RICHARD J. READE, DAVID F. BROWN,
and ELLEN POSIVACH,

      **Defendants.**
_____/

**<u>ORDER</u>**

THIS CAUSE comes before the Court upon Defendants' Motion to Dismiss First Amended Complaint (Dkt. #17) and Plaintiff's response (Dkt. #18).  Having reviewed the First Amended Complaint and the arguments of the parties, the Court concludes that the motion should be granted in part and denied in part.

**I.**

William A. Sager ("Sager") is the former Police Chief of the City of Port Richey, Florida.  He is suing the City and various City employees alleging each violated his First Amendment right of free speech, and Defendant Mathias J. Brewi ("Brewi") also defamed him.  The parties do not agree on the facts but, at this motion to dismiss stage, the Court must accept the facts alleged by the Plaintiff as true.

Port Richey is a city located in Pasco County, Florida, in the Middle District of Florida.  Sager held multiple ranks within the City's police department from August 1985 through March of 2010.  In October 2003, he was appointed interim Chief of Police and then promoted to Chief of Police in February of 2004.  In January 2007, the City created a new position of Public Safety Director, merging the duties of Chief of Police and Chief of the Fire Department.  The new position required both police and fire certifications.  The City advised Sager that he could not be a candidate because he did not have a fire certification.

In April 2007, Jerry Calhoun ("Calhoun"), then City Manager of Port Richey, announced three finalists for the new position, one of which was Brewi.  Sager, as Police Chief, was not involved in selecting, interviewing or evaluating the qualifications of any of the three candidates.  Regardless, City Manager Calhoun directed Sager to give each candidate a tour to acquaint each with the City and answer questions regarding the police department.  During Brewi's tour, on April 17, 2007, Brewi commented on the then-current controversy surrounding Don Imus' references to African-American members of the Rutgers University Women's Basketball Team as "nappy-headed ho's."  Brewi noted that African-American people are not bothered when members of their own race use words such as "ho" and "nigger" to refer to other African-Americans, but that when white people do so, they are vilified.  Brewi also used the word "nigger" at other times during the tour to refer to and describe African-Americans in a derogatory manner.

The next day, April 18, 2007, Calhoun asked Sager what he thought of Brewi.  Sager reported Brewi's comments and said he was concerned about Brewi's candidacy because,

in his opinion, Brewi's use of derogatory racial comments "demonstrated marked insensitivity, prejudice, unprofessionalism and conduct that violates the public trust." Calhoun requested that Sager document his experience with Brewi in an interoffice memorandum and Sager did so.

On May 9, 20007, Calhoun informed Brewi of Sager's report detailing Brewi's use of racial epithets during his ride-along.  Calhoun furnished Brewi with a copy of Sager's memorandum and asked that Brewi provide a written response.  Brewi did so, and admitted making racial comments, but denied any discriminatory intent.  Brewi emphasized he was discussing the comments of others.  Apparently satisfied with Brewi's response, Calhoun selected Brewi to become the new Public Safety Director on May 11, 2007.  When Sager learned of Brewi's selection, he met with Calhoun seeking assurances that Sager would not suffer retaliation because of his earlier report.  Sager was assured by Calhoun that he should not worry and that Sager would remain second-in-command as Assistant Chief of Police.

Brewi began his job as Public Safety Director on May 14, 2007.  Within hours, Calhoun informed Sager that Brewi had decided that Sager should be moved back to patrol officer as a direct report to Brewi.  Calhoun said that if Sager "accepted that decision," he should write a memorandum stating the move was Sager's idea and completely voluntary. Sager, desiring to remain employed, wrote a memorandum indicating his desire to be reassigned to patrol officer.  On May 15, 2007, Brewi promoted David F. Brown ("Brown") to Lieutenant, Donald Young to Sergeant, and Robert Kern (who was facing pending disciplinary action of a demotion) to Sergeant.  None of these positions were offered to

Sager.  As Lieutenant, Brown was second-in-command.  There was no Assistant Chief of Police.

Between May and September of 2007, Brewi did not provide opportunities to Sager for overtime, shift differential, and evening shifts, despite Sager's request to obtain similar opportunities to those of his co-workers.  In September 2007, City Manager Calhoun resigned.  The City appointed City Attorney, James V. Mathieu, Jr. ("Mathieu") as Acting City Manager.

On September 25, 2007, the *St. Petersburg Times* published an article reporting Brewi's racial comments to Sager during the April tour.  The article noted that Sager had documented the comments in an interoffice memorandum which was now missing from the public record.  Sager had kept a copy of the memorandum for his personal file.  Sager publicly commented to the press that Brewi's use of racial slurs was "disgusting" and "unprofessional."  Concerned citizens made similar comments.  Sager also publicly commented to the press that the memorandum's absence from the public record was a violation of the Public Records Act and a matter of important public interest.

The day after the article was published, Brewi required Sager to provide a copy of the missing memo and accused Sager of tampering with a public record.  Mathieu also stated that Sager was holding a public record.  Sager provided a copy of the memorandum to Mathieu and Brewi.

About two weeks later, on October 7, 2007, the City Council raised the issue in an open meeting.  Mathieu discredited Sager by labeling him as a "disgruntled employee" and

a "liar." And Mathieu excused Brewi's past use of racial comments and described the Police Department's loss of a public record as a "non-issue." During the weeks following the meeting, Brewi continued to prohibit Sager from obtaining overtime and ordered him to "flex out" the hours he worked in excess of 40 although other officers were paid for overtime hours worked.

On November 22, 2007, Sager suffered a work place injury while restraining a criminal suspect during an arrest.

In December 2007, the City hired Richard J. Reade ("Reade") who replaced Acting City Manager Mathieu. Brewi and Reade accused Sager of failing to follow proper protocol when he took sick time. This resulted in a perceived unexcused absence for which Sager was threatened with disciplinary action.

In January of 2008, Sager filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") asserting that the hostility and multiple adverse employment actions were a result of his complaints several months earlier regarding Brewi's racial comments. When the grievance was filed, Brewi ceased all professional interactions with Sager and placed Brown in charge of getting messages and assignments to Sager. In a conversation with Sager's fellow officers, Brewi referred to Sager as "a cancer to the department." Reade took no disciplinary action against Brewi for this statement.

On May 15, 2008, Brewi resigned. Reade appointed Brown as the Chief of Police. On May 16, 2008, Brewi called Sager in for an exit interview in which Brewi ordered Sager to "sit down and shut up" and accused Sager of a variety of misdeeds, referring to him as a

"thorn in his side" for the entire year.  Brewi, unbeknownst to Sager, tape recorded the meeting.  Reade learned of the tape recording, but considered it a private matter rather than a public record.  He therefore did not obtain a copy of the recording for the City's records.

About four days later, Sager learned of the recording.  Sager believed the recording was either a public record or illegal.  On May 20, 2008, Sager made a public record request forcing Reade to investigate the missing recording.  Reade requested a copy of the tape recording and requested clarification of the incident from Brewi.  Brewi acknowledged taping the conversation without Sager's consent, saying that legal counsel advised him that doing so would not be an illegal act.  Brewi said the tape had been destroyed inadvertently.  A week or so later, in June of 2008, Sager filed a criminal complaint with the Pasco County Sheriff's Office regarding the recording.  And in August of 2008, Sager filed a complaint with the Florida Department of Law Enforcement ("FDLE") requesting an investigation into what Sager contended was an illegal taping of his exit interview.  According to Sager, he "sought to expose misfeasance or malfeasance within the city regarding yet another incident of missing public records and perceived corruption within the Police Department and commented in the same manner, as have other concerned citizens, that Brewi, a police officer himself, crossed 'certain lines that you can't cross as a police officer.'"

Also that summer, in June of 2008, Sager filed a Notice of Injury for his earlier injury in November of 2007.  The City provided Sager with a claims number and instructions on how to seek treatment and payment for his injuries.  Reade instructed the City's insurance carrier to pay his claims through September 3, 2008.

In late August of 2008, a "tongue-in-cheek memo" surfaced reporting to be an interoffice memo from Reade addressing personnel issues.  The memo was objectively distasteful and unprofessional.  Reade publicly accused Sager of preparing and disseminating the memo, though the memo contained no reasonable inference that it was authored by Sager.  On September 3, 2008, Reade terminated Sager by certified mail without notice or an opportunity to contest allegations that he authored the memo.

According to Sager, he, "as a concerned citizen and not as part of his official job duties, publicly voiced his concern over the City's failure to implement proper protocol in releasing him, a union member and public employee, without investigation or a hearing by filing a grievance with the City and report of the same to the *St. Petersburg Times*."  Pursuant to the grievance procedure, the City conducted a post-termination hearing on September 18, 2008.  Sager, "as a concerned citizen and not as part of his official job duties, publicly noted that a 'post-termination hearing' was a violation of Chapter 112, Florida Statutes, and had it not been for Sager's exposure to the press, such misfeasance or malfeasance in city government would have remain unchecked."  As a result of the grievance hearing, Reade reinstated Sager, but placed him on paid leave pending further investigation of the memo.  Further investigation cleared Sager of the distasteful memo incident.

In October of 2008, Reade reinstated Sager, but instead of allowing him to come back to his duties, placed him on immediate medical leave.  Reade claimed that, because of Sager's November 22, 2007 injury, the City had to assure that Sager had clearance to return to full duty.  Sager claimed that being placed on medical leave was in further retaliation for

his numerous comments and petitions and contends that other officers similarly injured on the job were afforded the opportunity to work light duty shifts.  Sager obtained medical clearance and returned to work on October 13, 2008.  At the same time, the City's insurance carrier notified Sager that it was retroactively denying his worker's compensation claim contending that his injuries were the result of a prior existing condition.

On December 17, 2008, Reade was terminated as City Manager.  Ellen Posivach ("Posivach") was appointed interim City Manager.  Several months thereafter, Posivach became the City Manager.

On December 17, 2008, Brown publicly reprimanded Sager in front of other employees asserting that Sager had been disrespectful of City Council members and Reade for not waving to them in the parking lot.  And from December of 2008 through March of 2009, Brown continued the policy of disallowing Sager, alone, the opportunity to work overtime hours.  During the same period, an opening for Sergeant became available.  Brown and Posivach rescinded the City's offer to give the Sergeant's exam to eligible candidates when Brown learned that Sager had expressed an interest in sitting for the exam.  In March of 2009, a less qualified individual was appointed to the Sergeant position without administration of an exam.

On January 24, 2009, Sager sustained another work place injury and filed a Notice of Injury.  Even though he was injured, the City kept him on full duty and did not permit him to perform light duty work.  Thereafter, Posivach acknowledged the orders of Sager's physician for relegation to light duty and he was allowed to perform light duty work.  In July

of 2009, the workers' compensation carrier reinstated Sager's 2007 worker's compensation claim as valid retroactive to the day of injury.

On September 15, 2009, Brown promoted Sager to Detective but withheld any increase in pay.  As Detective, Sager was directed to conduct a taped investigation of a City employee to determine if the employee had committed a criminal act.  During the interview, Brown entered the interrogation room with the Public Works Director and, in continuing an on-going conversation, commented that certain City Council members deserved to be "whacked up side the head with a two-by-four."  The comments were captured on the tape recording.  Following the interview, Sager submitted the tape, without erasing Brown's comments, to the person in charge of public records.

On December 15, 2009, Lieutenant Donald Young ("Young") began an investigation of Sergeant Robert Kern ("Kern") for use of excessive force.  Young determined that Kern did in fact use excessive force, but Brown and Posivach withheld any disciplinary action. Sager publicly voiced his concern that the decision by Brown and Posivach to withhold disciplinary action on Kern was tantamount to cronyism and corruption in the Police Department.  Also, Sager publicly voiced his concern that Posivach was spending excessive amounts of taxpayer funds on trips and meetings while not devoting adequate time to her position as City Manager.  As a result of Sager's comments regarding Brown's cronyism and Posivach's spending, the *St. Petersburg Times* made a public records request for the personnel files of both Kern and Brown in February of 2010.

On March 1, 2010, the *St. Petersburg Times* published an article criticizing Brown's recorded comment about Council members deserving to be "whacked up side the head" and the lack of disciplinary action against Kern.  On March 15, 2010, Brown, by order of the City Manager, called a departmental meeting wherein he warned the members of the police force to "keep your mouths shut regarding departmental affairs or leave the department."  Also about that time, the *St. Petersburg Times* made a public records request for the spending records and employment contract of City Manager Posivach.

On March 30, 2010, Brown and Posivach issued a termination letter to Sager stating that the duration of his light duty service had become a strain on the Department.  It further stated that Sager's benefits would be lost as a result of his termination.  Sager filed a grievance the next day contending that the denial of continued employment benefits was a violation of his collective bargaining contract.  On April 8, 2010, the City paid Sager for certain of his benefits, but not others, and failed to continue his employment.

In his first Amended Complaint, Sager makes the following claims:

| | |
|---|---|
| Count One: | The City of Port Richey violated his First Amendment Right of free speech; |
| Count Two: | Brewi violated his First Amendment Right of free speech; |
| Count Three: | Brewi committed defamation; |
| Count Four: | Reade violated his First Amendment Right of free speech; |
| Count Five: | Mathieu violated his First Amendment Right of free speech; |
| Count Six: | Brown violated his First Amendment Right of free speech; and |

<u>Count Seven:</u>        Posivach violated his First Amendment Right of free speech.

## II.  Standard of Review

Determining the propriety of granting a motion to dismiss requires courts to accept all the factual allegations in the complaint as true and evaluate all inferences derived from those facts in the light most favorable to the plaintiff.  *See Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994).  Nonetheless, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).  To survive a motion to dismiss, a plaintiff's complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

While in the ordinary case a plaintiff may find the bar exceedingly low to plead only more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action," it is clear that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1959, 1965; *see also Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974, n. 43 (11th Cir. 2008) (noting the abrogation of the "no set of facts" standard and holding <u>*Twombly*</u> "as a further articulation of the standard by which to evaluate the sufficiency of all claims").  Absent the necessary factual allegations, "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" will not suffice. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

## III.

Defendants contend that Sager's Complaint should be dismissed because all defendants are entitled to qualified immunity.  In support, they argue the actions complained of were taken within the scope of each Defendant's discretionary authority and did not violate Sager's clearly established constitutional rights.   And Defendants claim Sager's speech is not protected by the First Amendment since it involved his individualized concerns as an employee and not as a private citizen on a matter of public concern.   Brewi contends the defamation claim against him should be dismissed because the statements he is accused of making are absolutely privileged and mere opinions.   Sager argues that all of his speech was made as a concerned citizen rather than in his capacity as an employee, and that, since he has alleged such to be a fact in his Complaint, this Court cannot dismiss his First Amendment claims at the motion to dismiss stage.

A government official is entitled to qualified immunity when the facts taken in the light most favorable to the complaining party show (1) his acts were taken pursuant to the performance of his duties within the scope of his authority, and (2) there was no constitutional violation.  To show a constitutional violation, a complaining party must demonstrate that the asserted right is protected by the Constitution and that he suffered an adverse employment action for exercising the right.  *Akins v. Fulton County, Georgia*, 420 F. 3d 1293 (11th Cir. 2005).  The parties agree that Defendants' actions were within their discretionary authority.  So the focus here is whether Plaintiff's speech was protected by the Constitution and whether he suffered an adverse employment action.

Government regulation of employees' speech differs from its regulation of the speech of private citizens. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684 (1983). A public employee has a right to engage in free speech and self expression while participating in public and social affairs. *Connick*, 461 U.S. at 145, 103 S.Ct. at 1689. But such protection is unavailable "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690.

The Court will focus on which of Sager's claimed acts of speech is protected. Punishment, demotion or even acts of retaliation are not a constitutional violation if the speech is unprotected. That is, if the speech is unprotected, there is no constitutional violation, and the Plaintiff cannot overcome Defendants' claim to qualified immunity.

Plaintiff's attempt to avoid qualified immunity by pleading that Sager, in each act of speech, acted only as a private citizen concerning a matter of public importance, does not immunize his speech from scrutiny at the motion to dismiss stage. This Court is required to apply the qualified immunity defense at the motion to dismiss stage because it is both a defense to liability and an entitlement not to stand trial or even face the discovery process if the qualified immunity doctrine applies. *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009).

In deciding whether Sager's speech relates to his job as opposed to an issue of public concern, the Court must look to "the content, form, and context of a given statement. . . ." *Connick*, 461 U.S. at 147-48, 103 S.Ct. at 1690. Whether a plaintiff's speech relates to matters of public concern is a legal question. *Ferrara v. Mills*, 781 F.2d 1508 (11th Cir.

1986).  And courts grant deference to government restrictions on employee speech in order to balance the government employer's legitimate interest with that of the employee.  *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985 (9th Cir. 2007) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951 (2006)).

Discerning whether an employee's speech has to do with his job or is made as a private citizen as a matter of public concern is not always easy.  Statements about one's job in government work places often concern matters of public interest.  Government work is supposed to deal with matters of public concern.  And when it does, a "public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."  *Ferrara*, 781 F.2d at 1516.  The relevant inquiry is the purpose of the speech.  If an employee raises an issue to further his own employment interests, his First Amendment right to comment on that issue is entitled to little weight.  *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2nd Cir. 1993).  With that in mind, the Court turns to address the speech Sager claims was violated.

## Count One

A.      The first four acts Sager identifies in Count One are related:

(1)      his response to Calhoun regarding Brewi's racial comments,

(2)      his interoffice memorandum documenting Brewi's racial comments,

(3)      his public comments to the *St. Petersburg Times* that Brewi's use of racial slurs was unprofessional and that the memorandum's absence from the public record constituted a violation of Florida law, and

(4)      his filing of an EEOC charge concerning Brewi's and Mathieu's retaliation for

his speaking out.

Sager contends all these incidents were outside his job duties and therefore constituted

his speech as a private citizen.  But each act is inextricably linked to his job performance,

starting with his giving Brewi a tour of the City.  Sager's superior, City Manager Calhoun,

directed that Sager give the tour to acquaint Brewi with the City.  Then, Calhoun asked for

Sager's impressions of Brewi gathered during the tour.  Sager's reporting of Brewi's racial

comments was in response to this request.  Likewise, the committing of the report to writing

in the form of a memorandum was in direct response to his superior's request and, therefore,

part of Sager's job.

The Eleventh Circuit has previously held that a police report and the subsequent

discussion of it is not speech on a matter of a public concern even though it contains

information which places the Police Department in a bad light.  *Morris v. Crow*, 142 F.3d

1379 (11th Cir. 1998).  In *Morris*, a deputy claimed he was fired because he wrote in an

automobile accident report that another deputy acted inappropriately by traveling more than

130 mph in a 50 mph zone without using his emergency warning lights in violation of

Sheriff's Office policy.  A crash ensued causing the death of a citizen.  Subsequently, the

deputy made the same statements in a deposition in a civil suit brought by the estate of the

victim.  *Id.* at 1381.  The Eleventh Circuit held that the report and subsequent deposition

were not protected speech.  It noted that the completion of the accident report was a part of

the deputy's job.  And, in the subsequent deposition, the deputy merely reiterated his earlier

statements concerning the accident.

Like the deputy in *Morris*, Sager's report to Calhoun, both verbal and written, was

part of his job.  When he repeated the same comments to the press almost five months later,

it did not transform them into constitutionally protected speech.  His further elaboration that

he had put Brewi's comments in a written report and the report was missing was more about

him and his job experiences rather than a public concern about a missing document.  As the

Court noted in *Morris*, a report on a co-employee's policy violations that jeopardize public

safety may be of general interest to the public but did not alone make it of "public concern"

for First Amendment purposes.  *Id.* at 1381.

Also instructive is *Burton v. City of Ormond Beach, Florida*, 301 Fed. Appx. 848 (11th

Cir. 2008).  Burton was the Director of Leisure Services for Ormond Beach, Florida.  Part

of Burton's job duties was to maintain the recreational facilities and ball parks of the city.

A private citizen e-mailed Burton complaining about foul baseballs flying into overgrown

underbrush near one of the city's ball fields and suggested the installation of netting to cure

the problem.  Burton responded by e-mail that he would be glad to include the request for

netting in the next year's fiscal budget and forward the underbrush issue to Public Works for

a work order.  One of the recipients of that e-mail responded with his thoughts on the matter

and included the City Commission, City Manager and other city employees.  *Id.* at 850.  One

of the City Commissioners responded and criticized Burton about his handling of the

complaint.  Burton then sent a lengthy e-mail to the Commissioner and the private

individuals explaining how he was attempting to improve the system and, in doing so, criticized the City's organizational structure and management.  The e-mail noted the managerial difference between Leisure Services and Public Works (which was in charge of the undergrowth issue), mentioned that Burton had been passed over for several earlier promotions, criticized City Manager Turner's performance, and raised the notion that Turner had violated the Florida Sunshine Laws.  *Id.* at 851.

When Burton was subsequently fired, he claimed that he was fired for exercising his First Amendment right to freedom of speech on matters of public concern.  He contended that his e-mail was an effort to improve the system and that his mention of Turner's possible Sunshine Law violation was a matter of public concern.  *Id.* at 851.  The Eleventh Circuit held that the e-mail was not protected speech.  Even though it was directed, in part,  to private citizens and concerned a possible violation of the Sunshine Law, the main thrust of the e-mail was for Burton to defend himself because he thought he had been unfairly criticized.  The Eleventh Circuit pointed out that Burton's mention of the possible Sunshine Law violation was not the "impetus" for Burton's e-mail.  As in *Burton*, the one missing document here was not the "impetus" of Sager's statements to the press.

Likewise, Sager's EEOC complaint is not protected speech.  The EEOC complaint, by its very nature, concerned acts taken by him and others in the course of his employment, not as a private citizen.  And there are other statutory provisions designed to redress retaliation for filing an EEOC complaint.  *See* 42 U.S.C. § 2000e, *et. seq.*

For these reasons, the Court concludes that Sager's initial report of Brewi's racial comments to Calhoun, his written memo about the comments, his repeating the comments to the press and noting his memo was missing, and his later EEOC complaint were all matters concerning his job, and not raised as a matter primarily of public concern. As such, they are not protected by the First Amendment. Therefore, the Defendants are entitled to qualified immunity as to the claims relating to these incidents.

**B.**     The next series of related items found in Count One deal with Brewi's surreptitious tape recording of Sager's exit interview. Sager claims the following incidents are protected speech made as a private citizen and not as a public employee:

(1)     his reporting to Reade that Brewi's tape recording was a violation of law,

(2)     his public record request to Reade to initiate an investigation into the illegal taping,

(3)     his filing of a criminal complaint against Brewi with the Pasco County Sheriff's Office, and

(4)     his filing of a criminal complaint against Brewi with the FDLE.

Sager attended the exit interview as part of his job. Brewi's actions during the interview, whether right or wrong, do not make the event any less a part of Sager's employment. Sager's reactions upon learning of the secret recording were prompted by and relate to his personal job experience. But a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest through his personal complaints. *Ferrara*, 781 F.2d at 1516.

The report of the incident to Reade, Brewi's immediate superior, is an every day response to an on-the-job dispute.  An attempt to turn up the heat by simultaneously invoking a public records request does not remove it from the realm of an on-the-job dispute.  The impetus behind these actions was clearly a job related grievance.  And if Sager truly thought the tape recording was illegal, which he claims, then it was part of his job responsibility to report it, and all other criminal acts, to the appropriate law enforcement authority.

In short, Sager's report to Reade of the secret tape recording, his public records request to Reade to obtain a copy of the recording, and his filing of criminal complaints with the Pasco County Sheriff's Office and the FDLE are all job related and of personal interest to him.  They do not constitute protected speech and the Defendants are entitled to qualified immunity as to these incidents.

**C.**     Sager also claims in Count One his right to First Amendment speech was violated in reference to his "comment to the press and simultaneous filing of a grievance that the City violated proper protocol, and his constitutionally protected right to procedural due process in releasing him, a public employee, without notice and an opportunity to be heard."  In making this claim, Sager once again attempts to convert a job related grievance process into a matter of public concern.

Sager acknowledges that he was a member of a police union and, as such, was entitled to certain protections before he could be fired.  One of those rights was to have a due process hearing in which he could defend himself against the charges.  When he was not afforded that right, he properly filed a grievance.  As a result of that grievance process, he was reinstated.

His public complaints about his treatment do not transform that standard job related process into a matter of public concern.

Therefore, Sager's complaints to the press about his termination without a hearing is not protected speech and the Defendants are entitled to qualified immunity.

**D.**     Sager's final claims in Count One relate to his public comments to the press as to:

(1)     the Police Department's failure to discipline Kern for his use of excessive force, and

(2)     City Manager Posivach spending excessive amounts of taxpayer funds on trips and meetings while not devoting adequate time to her position.

Neither of these matters involve Sager's job or him personally.  Reporting of corruption in a police department or the mismanagement of City funds can, under appropriate circumstances, constitute a matter of public concern.  *Akins v. Fulton County, Georgia*, 420 F.3d 1293 (11th Cir. 2005).  At this stage, the Court is unable to rule as a matter of law whether these complaints are unprotected.  Therefore, the City's motion to dismiss the claims regarding these incidents will be denied.

The First Amended Complaint alleges many acts were taken by the Defendants in retaliation for Sager's exercise of his First Amendment rights.  Now that the Court has granted qualified immunity to the Defendants as to many of the claimed acts of speech, the Court is not certain which acts of retaliation the Plaintiff will continue to claim.  Therefore, the Court will not address the acts of retaliation at this point, but will allow the Plaintiff to

amend the First Amended Complaint to more succinctly set forth the surviving claims of protected speech and the acts of retaliation claimed to relate thereto.

### Counts Two - Seven

Sager's claims against Brewi in Count Two and against Reade in Count Four concern incidents for which the Court has ruled these Defendants are entitled to qualified immunity. Therefore, Counts Two and Four will be dismissed with prejudice.

In Count Three, Sager alleges Brewi defamed him by remarking to third parties that Sager was a "cancer to the Police Department" and that he had "fucked over every member of the Police force." In an earlier part of the Complaint (paragraph 97), Sager alleges the "cancer" comment was made to other members of the Police force, but nowhere in the Complaint does Sager identify the third party to whom the other comment was allegedly made. In this regard, Count Three is deficient. Since the Plaintiff must file an Amended Complaint because of this Court's ruling concerning Count One, the Court directs the Plaintiff to identify when and to whom the offending statements are claimed to have been made.

Brewi argues that Count Three should be dismissed because the comments were absolutely privileged. The parties agree, though, that to be privileged, the statements had to be made within the scope of the employee's office or in connection with his duties. The circumstances surrounding the comments must be more fully explored in discovery before the Court is able to rule on the privilege issue. Brewi also contends that the comments were statements of pure opinion which cannot support a claim for defamation. Sager

acknowledges that statements of pure opinion do not support a defamation claim but argues that these were statements of fact, particularly the one claiming that Sager "had wronged everyone in the Police Department."

In Florida, whether a statement is one of fact or opinion is a question of law, but depends on several factors.  Pure expressions of opinion are constitutionally protected, but mixed expressions of opinion are not.  The difference between the two is explained in *The Town of Sewall's Point v. Rhodes*, 852 So. 2d 949 (4th DCA 2003):

> Pure opinion is based upon facts that the communicator sets forth in a publication, or that are otherwise known or available to the reader or the listener as a member of the public.  Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication.  Rather the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion.

*Town of Sewall's Point*, 852 at 951 (citing *Morse v. Ripken*, 707 So. 2d 921 (Fla. 4th DCA 1998)).

The workplace is full of derogatory hyperbole such as: "John is always late" or "Sara always messes things up and I have to come behind her and fix it."  It is difficult to believe that such expressions can give rise to a defamation suit, but the parties have cited no cases in this regard.  For this reason and because all facts surrounding the comments have not been explored, the arguments concerning Count Three are best resolved on summary judgment.

In Count Five, Sager claims Mathieu, while Acting City Manager, violated his First Amendment right of free speech by "Mathieu's decision to engage in or ratify corresponding retaliatory acts and adverse employment actions including:"

(1)     Mathieu's public discrediting of Sager in the open Council meeting by calling

him a "liar" and a "disgruntled" employee, and

(2)     Brewi's and Mathieu's accusations against Sager that he was tampering with

public records, and Mathieu's "ratification" of Brewi's adverse employment

actions.

Mathieu argues this Count should be dismissed because he cannot be liable for "ratifying"

the acts of another, and none of the acts he committed constituted an adverse employment

action.  For support, Mathieu notes that vicarious liability is not available in a § 1983 action

and points to the following language of the Supreme Court in *Iqbal*:

> That is to say, respondent believes a supervisor's mere knowledge of his
> subordinate's discriminatory purpose amounts to the supervisor's violating the
> Constitution.  We reject this argument. . . . Absent vicarious liability, each
> government official, his or her title notwithstanding, is only liable for his or
> her own misconduct.

129 S.Ct. at 1948.

The only act Sager accuses Mathieu of personally committing is describing Sager as

a liar and a disgruntled employee in an open City Council meeting.  Those comments do not

amount to an adverse employment action.  An adverse employment action must involve an

important condition of employment, such as a discharge, demotion, refusal to hire or

promote, or reprimand.  *Akins*, 420 F.3d at 1300.

Sager asserts that Mathieu is liable for Brewi's adverse employment actions.  Sager's

reasoning is that "in light of the public controversy concerning Brewi's racial comments,

Mathieu [by his comments at the Council meeting] had publicly accepted and condoned

Case 8:10-cv-01069-JSM-TGW   Document 21   Filed 11/22/10   Page 24 of 27 PageID 270

Brewi's retaliatory acts against Sager.  In this fashion, Plaintiff has pleaded that Mathieu's own individual actions violated the Constitution."  Sager cites *Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010) as support for this proposition.  In *Keating*, a group of protestors sued the Miami Chief of Police and several of his ranking officers alleging that they personally directed subordinate law enforcement personnel to "herd" the demonstrators off public property, use batons to beat them, and discharge bean bags, pepper spray balls, tear gas, and other projectiles to do so.  *Id.* at 758.

The direct participation alleged in *Keating* is not present in the instant case.  In *Keating,* the Eleventh Circuit explains the difference between the allegations there and the allegations Sager makes here against Mathieu:

> It is well established that § 1983 claims may not be brought against supervisory officials on the basis of vicarious liability or respondeat superior. *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (citing *Hardin v. Hayes*, 957 F.2d 845, 849 (11th Cir. 1992)).  However, supervisors are liable under § 1983 "either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Gonzalez v. Reno*, 325 F.3 1228, 1234 (11th Cir. 2003) (citing *Braddy v. Fla. Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)).  A causal connection can be established by, *inter alia*, "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* at 1235.

*Keating*, 598 F.3d at 762.

Since Mathieu did not personally participate in or direct the actions complained of, and did not himself commit an adverse employment action, he is entitled to qualified immunity and Count Five must be dismissed with prejudice.

Page 24 of  27

In Count Six, Sager sues Brown, the person promoted to Chief of Police upon Brewi's resignation.  Sager claims Brown committed various adverse employment actions because of Sager's exercise of the following incidents of First Amendment speech:

(1)    reporting to Reade that Brewi's tape recording was a violation of law and his public record request for a copy of the tape,

(2)    filing a criminal complaint against Brewi with Pasco County Sheriff's Office,

(3)    requesting public records aimed as discovering misfeasance or malfeasance in the Police Department,

(4)    filing a complaint regarding Brewi's illegal tape recording with the FDLE,

(5)    commenting to the press and filing a grievance that the City violated his right of due process in terminating him without notice,

(6)    publicly commenting on the withholding of Kern's disciplinary action, and

(7)    speech regarding Brown's unprofessional commentary about a City Council member.

The Court has discussed each of these alleged incidents except the last:  "Sager's speech regarding Brown's unprofessional commentary about a City Council member."  In this incident, Brown's statement that certain of the Council members needed to be "whacked up side the head with a two-by-four" was captured on tape during Sager's criminal interview of a witness.  Sager turned in the tape as evidence at the conclusion of the interview without erasing Brown's comments.  Brown's comments captured on tape were Brown's speech, not

Sager's.  And by turning in the tape, Sager was merely performing a function of his job.  In sum, this incident does not constitute protected speech by Sager.

Of the remaining items complained of, only Sager's public comments concerning the withholding of Kern's disciplinary action can be considered a matter of public concern and potentially protected speech.  The evaluation of this incident is best left to summary judgment.  Therefore, all claims in this Count based on First Amendment speech are hereby dismissed except that concerning the withholding of Kern's disciplinary action.  And again, the Court deems it unnecessary to rule on Sager's claimed adverse employment actions at this point.

Count Seven asserts a claim against Posivach, the person succeeding Reade as City Manager.  Sager claims the following incidents of speech were violated:

(1)     request for public records aimed at discovering misfeasance and/or malfeasance in the Police Department,

(2)     filing a complaint regarding Brewi's illegal tape recording with the FDLE,

(3)     publicly commenting on the withholding of Kern's disciplinary action,

(4)     speech regarding Brown's unprofessional commentary about a City Council member, and

(5)     publicly commenting about Posivach's exorbitant spending of City funds and improper use of City time.

Of these incidents, only Sager's public comments and requests for public records concerning the withholding of Kern's disciplinary action and Posivach's actions as City

Manager are potentially protected by the First Amendment.  The claims as to the other alleged incidents are dismissed.  The Court deems it unnecessary at this point to address the adverse employment actions.  But the Court directs Plaintiff to pay attention to *Akins'* definition of an adverse employment action in drafting a Second Amended Complaint.

## V.

It is therefore ORDERED AND ADJUDGED that:

1.    Defendants' Motion to Dismiss First Amended Complaint (Dkt. #17) is GRANTED in part and DENIED in part as stated herein.

2.    Counts One, Three, Six and Seven are dismissed without prejudice.

3.    Counts Two, Four and Five are dismissed with prejudice.

4.    Plaintiff may file an amended Complaint consistent with this Order within twenty (20) days of the date of this Order.

**DONE** and **ORDERED** in Tampa, Florida on November 22, 2010.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>**Copies furnished to:**</u>
Counsel/Parties of Record

S:\Odd\2010\10-cv-1069.mtd 17.frm